## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISON

KENNETH J. WOODSIDE,

     Plaintiff,                                  Case No.

v.                                             Hon.

THE BOARD OF REGENTS OF
THE UNIVERSITY OF MICHIGAN,
CHRISTOPHER SONNENDAY, and
JUSTIN DIMICK,

     Defendants.

---

David A. Nacht (P47034)
Fabiola A. Galguera (P84212)
NACHTLAW, P.C.
*Attorneys for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
(734) 663-7550
dnacht@nachtlaw.com
fgalguera@nachtlaw.com

---

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff KENNETH J. WOODSIDE, M.D. (hereinafter referred to as "Dr. Woodside"), by and through his attorneys, NACHTLAW, P.C., and hereby alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    Dr. Woodside is an individual residing in Ann Arbor, Washtenaw County, Michigan.

1

2.      Defendant the Board of Regents of the University of Michigan (hereinafter referred to as "U-M") is the publicly elected governing body of U-M, a publicly funded and state-operated university located in Ann Arbor, Michigan. U-M receives state and federal funding for the provision of higher education.

3.      Defendant Christopher Sonnenday, sued in his personal capacity, is an adult individual residing in Washtenaw County, Michigan.

4.      Defendant Justin Dimick, sued in his personal capacity, is an adult individual residing in Washtenaw County, Michigan.

5.      On March 8, 2023, within the applicable notice periods set out in M.C.L. 600.6431, Dr. Woodside filed a Notice of Intent with the Michigan Court of Claims stating his intention to bring due process, breach of contract, and Elliott-Larsen Civil Rights Act ("ELCRA") claims against Defendant U-M, as is required under Michigan law in order to bring state claims against an arm of the state.

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(4) (jurisdiction over civil rights claims).

7.      This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims.

8.      Venue is proper in this Court under 28 U.S.C. § 1391 and 29 U.S.C. § 621 *et seq.*, as this is the judicial district in which Defendants operate, and in which

the wrongs alleged herein occurred.

## GENERAL ALLEGATIONS
### Defendant U-M Improperly Non-Renews Dr. Woodside

9.      Dr. Woodside is an esteemed transplant surgeon who was, until September of 2022, an employee of the University of Michigan Hospital, an entity owned and run by Defendant U-M.

10.      Dr. Woodside was one of the leading transplant surgeons at Defendant U-M, with records for most kidneys transplanted.

11.      Dr. Woodside did not have any prior reprimands and instead was regularly rewarded for his outstanding service as a physician and faculty member.

12.      Dr. Woodside, along with another physician, had brought patient safety issues to the Chief of Staff Marie Luzon about the U-M dialysis procedure unit.

13.      Dr. Woodside informed Defendant Dimick of this patient safety issue and their reporting of it in November 2019.

14.      Additionally, Dr. Woodside informed Defendant Sonnenday of the patient safety issue and the reporting of it soon after the accusation described next.

15.      Unfortunately, Dr. Woodside was later wrongfully accused of assault and battery by Debra LaMirand, a fellow employee of the University of Michigan Hospital working at that very dialysis unit, based on events which she alleges occurred on December 27, 2019, at the University of Michigan Hospital.

16.     On or around January 6, 2020, Ms. LaMirand filed a report with the University's Office of Institutional Equity ("OIE") based on her false allegations against Dr. Woodside.

17.     On April 7, 2020, after conducting a thorough investigation— which included interviewing several witnesses identified by Ms. LaMirand— OIE found that the "evidence does not support the conclusion by a preponderance of the evidence that [Dr. Woodside] engaged in conduct that constitutes a violation of the *Sexual Harassment Policy*, SPG 201.89."

18.     Unfortunately, due to Ms. LaMirand's wrongful accusations, criminal charges were brought against Dr. Woodside, forcing him to defend himself in criminal proceedings.

19.     Dr. Woodside was assured by Defendant Dimick that he would still have a job after the criminal proceedings, no matter the outcome, as the decision would be made by Defendant Dimick himself and that he knew the overall situation, particularly with regard to the whistle blowing for the dialysis procedure unit.

20.     On September 3, 2020, Dr. Woodside received similar assurances from U-M Executive Vice Dean Brian Zink in a Zoom call, with the comment that they, meaning Dr. Zink and the administration, knew what the real situation was, particularly with regard to the whistle blowing for the dialysis procedure unit and the probable interaction between the events.

4

21.     On December 13, 2021, a criminal jury trial took place wrought with errors prejudicial to Dr. Woodside.

22.     Though Dr. Woodside was eventually convicted of assault and battery, he has appealed that conviction and his appeal remains ongoing.

23.     Even with the conviction, he was given a year of probation only – from which he was excused early.

24.     On January 3, 2022, Defendant U-M informed Dr. Woodside by letter that his appointment with the University of Michigan Hospital would not be renewed and would end on September 30, 2022.

25.     In the same letter, Dr. Woodside was informed that he was being placed on administrative leave effective immediately and, as a result, would not be assigned to or be allowed to perform clinical, research, and teaching activities.

26.     Defendant U-M made this decision (1) despite its own findings that there was insufficient evidence to support a conclusion that Dr. Woodside had violated the University's sexual harassment policy, (2) without engaging in any adequate process, and (3) as a direct result of its own discrimination against Dr. Woodside based on his gender.

27.     Dr. Woodside's inability to work in a clinic, hospital, or operating room and his suspension from performing surgeries have harmed his career and his ability to be hired by other hospitals in the future.

**Defendants Dimick and Sonnenday Insert Themselves
and Further Harm Dr. Woodside**

28.     Dr. Woodside's misfortune at Defendant U-M's hands was further
amplified by Defendants Dimick's and Sonnenday's actions, both of whom, upon
reasonable belief, were involved in Dr. Woodside's non-renewal.

29.     Looking first at Defendant Dimick, he was very clear to Dr. Woodside
that he would do what it took to destroy Dr. Woodside's career if he resisted at all,
despite the previous assurances that Dr. Woodside would keep his job.

30.     In a meeting with Defendant Dimick and section head Dr. John Magee
where the decision to non-renew was discussed, when Dr. Woodside tried to raise
concerns about the lack of fairness and process, Defendant Dimick told Dr.
Woodside: "we can do this the easy way...or the hard way. This is the easy way."

31.     Dr. Woodside was shocked by the threatening comment and felt
intimidated.

32.     Later, Dr. Woodside would be told by third parties that Defendant
Sonnenday had been circulating correspondence within the hospital, including a
letter, which served to push Dr. Woodside out.[1]

_____

[1] To this end, and related to both individual Defendants herein named, on October
19, 2023, undersigned counsel sent Defendant U-M's FOIA Office a FOIA Request
for:

"Any and all written communications between December 1, 2021 and February 1,
2022 from Dr. Christopher Sonnenday regarding Dr. Kenneth Woodside and/or his

33.     Defendant   Sonnenday   has   similarly   consistently   engaged   in inappropriate conduct toward Dr. Woodside.

34.     Defendant Sonnenday engaged in childish and inappropriate "pranks" and comments directed to Dr. Woodside.

35.     Defendant Sonnenday's attitude towards Dr. Woodside was affected by Defendant Sonnenday's own notions of what it means to be a "man."

36.     Defendant Sonnenday took issue with how Dr. Woodside expressed himself, telling Dr. Woodside that Dr. Woodside did not meet his personal definition of "manliness."

---

employment and other issues to any (individually or as any combination) of the following people:

- Dr. Brian Zink, Senior Associate Dean, Faculty and Faculty Development, bzink@med.umich.edu
- Dr.   Marie   Lozon,   Chief   of   Staff,   Michigan   Medicine, mlozon@med.umich.edu
- Dr.   Justin   Dimick,   Chair   of   the   Department   of   Surgery, jdimick@med.umich.edu
- David Mohr, Chief Department Administrator, Department of Surgery, dmohr@med.umich.edu
- Dr. John Magee, Professor, Transplant Surgery, mageej@med.umich.edu
- Dr. Dana Telem, Section Head, General Surgery, dtelem@med.umich.edu

Defendant U-M continues to delay responding without any justification beyond it is processing have many requests.  Additionally, Defendant U-M has now instituted a policy that all emails older than 2 years are to be deleted in February.

Undersigned counsel has submitted an additional FOIA request for which an appeal has been filed with regard to Defendant Sonnenday's communications.

37.     Defendant Sonnenday referred to those he considered unmanly as "Vagisil."[2]

38.     Due this inappropriate characterization of Dr. Woodside by Defendant Sonnenday, either he or other faculty members at Defendant U-M deemed it was appropriate to leave Vagisil wipes and a small purple rubber penis on Dr. Woodside's desk.

39.     As a fellow, Dr. Woodside had received a significant burn from a hot surgery headlight cable that hit his back; it caused Dr. Woodside to scream.

40.      Defendant Sonnenday used Dr. Woodside's scream in pain when burnt to justify calling Dr. Woodside unmanly.

41.     Once Defendant Sonnenday found about Ms. Lamirand's complaint, he only ramped up his bullying of Dr. Woodside.

42.     Defendant Sonnenday began to rally anyone and everyone against Dr. Woodside during the investigation for no reason other than to mess with Dr. Woodside.

43.     Defendant Sonnenday actively encouraged people to speak ill of Dr. Woodside to those with power over Dr. Woodside and made veiled threats that

---

[2] Vagisil refers to a feminine hygiene brand, which sells creams used around the outside of the vagina and other vaginal hygiene products, such as wipes. It is a product marketed towards women.

suggested Defendant Sonnenday would intentionally interfere with Dr. Woodside's career.

44.     As noted above – even with Defendant Sonnenday's interference – Dr. Woodside was vindicated by Defendant U-M, but this did not stop Defendant Sonnenday.

45.     Defendant Sonnenday told leadership, purportedly in the aforementioned letter, about an incident that occurred during a very difficult operation.

46.     Before that incident, Dr. Woodside had been stuck with a needle while doing a kidney transplant for a patient with HIV and was undergoing treatment due to a reaction to the prophylactic medications used to prevent HIV infection.

47.     The treatment may have contributed to the interaction, but this incident itself had nothing to do with Dr. Woodside's actions or decisions as a physician and, more importantly, resulted in no harm to anyone.

48.     Upon reasonable belief, when Defendant Sonnenday discovered Dr. Woodside was interviewing with several hospitals, organizations, and universities, he began speaking out against Dr. Woodside.

49.     Dr. Woodside was informed by one organization that Defendant Sonnenday had reached out to leadership, after discovering that the organization hired Dr. Woodside, to "express concerns" about their decision to hire Dr. Woodside.

9

50.     Defendant Sonnenday mentioned this event to bring into question Dr. Woodside's moral suitability as a physician.

51.     Furthermore, Defendant Sonnenday told leadership about an "incident" that occurred between Dr. Woodside and a nurse at U-M.

52.     This "incident" was expressly disproved by an eyewitness, the chaperone in the room, and investigated by Defendant U-M, clearing Dr. Woodside of any involvement after investigation by the Section Head of Transplantation as well as nursing management of the Operating Room.

53.     Defendant Sonnenday discussed this "incident" in a false and malicious manner to bring into question Dr. Woodside's professionalism and portray Dr. Woodside as a liar.

54.     Upon information and belief, Defendant Sonnenday also shared the same false information to other potential employers, such as Brigham, Harvard and MCW.

55.     As a result of Defendant Sonnenday's actions, Dr. Woodside, through undersigned counsel, sent a cease-and-desist letter to emailed the University's Senior Associate General Counsel Gloria Hage ("Ms. Hage") seeking to end Defendant Sonnenday's campaign against Dr. Woodside.

56.     After receiving the cease-and-desist letter, Defendant Sonnenday continued to speak ill of and falsely about Dr. Woodside.

10

57.    In September 2023, Dr. Woodside applied for a position with Johns Hopkins and received a very favorable recruitment call from the Director of the Transplant Center.

58.    Dr. Woodside was told by the Director that Defendant Sonnenday would be contacted by the Johns Hopkins Surgery Chair before a decision could be made.

59.    Before there was any contact with Defendant Sonnenday, Dr. Woodside was told that he was a good candidate for the position.

60.    Dr. Woodside messaged the Director of John Hopkins' transplant center on October 19, 2023, asking for an update on the consideration process.

61.    That same day, the Director regrettably informed Dr. Woodside that after the Johns Hopkins surgery chair contacted Defendant Sonnenday there was "no interest after that call."

**Defendant U-M Also Takes Improper Action Against Dr. Woodside by Failing to Indemnify Him Despite its Own Findings in 2022**

62.    On March 14, 2022, Ms. LaMirand and her husband filed a civil complaint against Dr. Woodside (the "Civil Action") baselessly alleging civil claims for assault and battery, intentional infliction of emotional distress, and loss of consortium, which have since been resolved.

11

63.     On April 8, 2022, shortly after receiving notice of the Civil Action, Dr. Woodside emailed Ms. Hage, formally requesting coverage under the University's Defense and Indemnification policy as stated in the University's Standard Practice Guide 601.09.

64.     This section states, in relevant part, that "[i]t is the University's policy to defend and indemnify employees who become parties to legal proceedings by virtue of their good faith efforts to perform their responsibilities of employment."

65.     In that email, Dr. Woodside pointed out that the accusations Ms. LaMirand had made in the Civil Action took place while he was on duty covering the kidney transplant service when there was no other faculty available due to the Holidays.

66.     On May 2, 2022, Ms. Hage replied to Dr. Woodside's email and stated that, after reviewing SPG 601.09, Defendant U-M was denying his request for defense and indemnification "because the conduct alleged in the lawsuit did not arise out of the good faith performance of" Dr. Woodside's duties, as the policy requires.

67.     The University took this position despite its own investigative findings that the evidence did not support Ms. LaMirand's claims against Dr. Woodside.

68.     On May 18, 2022, Dr. Woodside, through undersigned counsel, wrote a letter to Ms. Hage, renewing Dr. Woodside's request for defense and indemnification under SPG 601.09 and pointing out that a failure to indemnify Dr.

Woodside "is a potential breach of contract under Dr. Woodside's employment contract and the University's policies."

69.     The letter highlighted that the sole reason that Dr. Woodside was at the hospital on the date of the alleged misconduct was to perform his job, and that he had been performing his professional duties in good faith at the time of the conduct at issue in the lawsuit.

70.     This required his indemnification under SPG 601.09.

71.     Despite Dr. Woodside's attorneys' follow-ups, Defendant U-M did not change its position, sticking with its erroneous decision to refuse to defend and indemnify Dr. Woodside, in violation of Dr. Woodside's employment contract and its own policies.

## COUNT I
## VIOLATION OF DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION, 42 U.S.C. § 1983

72.     Dr. Woodside reasserts and incorporates the allegations set in the foregoing paragraphs as though fully reinstated herein.

73.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that "no state shall… deprive any person of life, liberty, or property, without due process of law."

74.     42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by person acting under the color of law.

75.     Dr. Woodside had a constitutionally protected interest in his faculty and hospital employment positions.

76.     Because the reputational stigma Defendants fostered against Dr. Woodside is related to his non-renewal, he also had a constitutionally protected liberty interest in his good name and reputation, *see Murtha v. Rossford Exempted Vill. Sch.*, No. 21-3449, 2021 WL 4950238, at *5 (6th Cir. Oct. 25, 2021).

77.     It is "well-settled" for purposes of § 1983 that Dr. Woodside's constitutionally protected liberty interest in his "reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the Fourteenth Amendment." *Gallow v. Pittis*, No. 2:17-CV-1007, 2019 WL 4192717, at *4 (S.D. Ohio, Sept. 4, 2019) (citing *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002)).

78.     Although Defendant U-M had completed its own investigation and cleared Dr. Woodside of the allegations against him, Defendants deprived him of the above-listed property and liberty interests anyways, without any procedural basis whatsoever.

79.     Dr. Woodside was entitled to due process of law prior to deprivation of

14

his property interests.

80.     Defendants' arbitrary and capricious decision to deprive Plaintiff of these interests without adequate process of law, and, in fact, despite Defendant U-M's own investigation and assurances that he would keep his job, represents a due process violation.

81.     Defendants acted under the color of state law in making the administrative decision to deprive Dr. Woodside's constitutionally protected property interests.

82.     A reasonable person or public official should have known that it is a violation of a person's clearly established constitutional rights to deprive him of meaningful due process.

83.     Accordingly, Defendants' actions outlined *supra* violated Dr. Woodside's clearly established constitutional rights, of which any reasonable person in their position would have known; they are therefore not entitled to qualified immunity.

84.     As a direct and proximate result of Defendants' unlawful actions, Dr. Woodside has suffered irreparable harm, injury, and damages, including, but not limited to, removal from his employment at U-M; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and

embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future.

85.    Dr. Woodside is entitled to punitive damages because Defendants engaged in the above-described conduct with malicious and evil intent, in callous disregard of Dr. Woodside's federally protected rights.

**COUNT II**
**SEX DISCRIMINATION IN VIOLATION OF**
**ELCRA, MCL 37.2201 *et seq*.**
***(As to Defendant the University of Michigan Board of Regents)***

86.    Dr. Woodside reasserts and incorporates the allegations set in the foregoing paragraphs as though fully reinstated herein.

87.    At all relevant times, Dr. Woodside was an employee and Defendant U-M was an employer as defined by ELCRA.

88.    The State of Michigan has waived its Eleventh Amendment sovereign immunity and consented to suit under ELCRA on behalf of Defendant U-M, which is an arm of the state.

89.    ELCRA prohibits discrimination in employment on the basis of sex.

90.    Dr. Woodside was qualified for his positions with Defendant U-M.

91.    Defendant U-M subjected Dr. Woodside to intentional discrimination based on his gender by arbitrarily and capriciously declining to renew his appointment without adequate process.

16

92.     Bias against men was a motivating factor behind Defendant U-M's decision to non-renew and terminate Dr. Woodside.

93.     Defendant U-M applied its policies and procedures in a manner that discriminated against Dr. Woodside on the basis of sex, causing him serious and unjustified damage.

94.     Based on the foregoing, Dr. Woodside was subjected to biased, prejudiced, and unfair treatment in violation of ELCRA.

95.     Defendant U-M acted willfully.

96.     As a direct and proximate result of Defendant U-M's unlawful actions, Dr. Woodside has suffered irreparable harm, injury, and damages, including, but not limited to, removal from his positions at U-M; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT III
## BREACH OF CONTRACT
### *(As to Defendant the University of Michigan Board of Regents)*

97.     Dr. Woodside reasserts and incorporates the allegations set in the foregoing paragraphs as though fully reinstated herein.

98.     At all relevant times, Defendant U-M maintained written policies, codes, and bylaws that establish procedures for, and require adequate cause for,

adverse actions against professors and staff, and a practice of not terminating appointments without good or just cause.

99.   Dr. Woodside received a copy of the aforementioned polices, codes, bylaws, and practices during his employment with Defendant U-M.

100.   Throughout the course of his employment with Defendant U-M, Dr. Woodside relied on the aforementioned polices, codes, bylaws, and practices of Defendant, which provide that employees like Dr. Woodside will not be removed from their positions without adequate cause or the opportunity for a fair hearing.

101.   The aforementioned polices, codes, bylaws, and practices constituted a contract of employment between Dr. Woodside and Defendant U-M and created contractual or quasi-contractual rights to a hearing prior to adverse employment action against Dr. Woodside.

102.   These policies also provide for indemnification of employees like Dr. Woodside in civil actions.

103.   Defendant U-M's policies, procedures, and practices gave Dr. Woodside a reasonable expectation of continued appointment and support in case of civil litigation.

104.   Contrary to Defendant U-M's policies, practices, and procedures, Dr. Woodside was non-renewed and terminated without the opportunity for a fair hearing and without good cause.

105. Furthermore, Defendant U-M declined to represent Dr. Woodside when explicitly required by its own policies.

106. Accordingly, Defendant U-M has breached its contractual duties to Dr. Woodside.

107. As a direct and proximate result of Defendant U-M's unlawful actions, Dr. Woodside has suffered irreparable harm, injury, and damages, including, but not limited to, removal from his positions at U-M; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH CONTRACT**
*(As to Defendants Sonnenday and Dimick)*

108. Dr. Woodside reasserts and incorporates the allegations set in the foregoing paragraphs as though fully reinstated herein.

109. Dr. Woodside had a contract with Defendant U-M at the time of the claimed interference.

110. Defendants Sonnenday and Dimick knew of the contract at that time.

111. Defendants Sonnenday intentionally and improperly interfered with the contract by negatively impacting Defendant U-M's investigation and improperly influencing Defendant U-M's decision not to renew the contract.

19

112.   Defendant Dimick intentionally and improperly interfered with the contract by improperly influencing Defendant U-M's decision not to renew the contract.

113.   Defendants Sonnenday and Dimick's conduct caused Defendant U-M to breach the contract.

114.   As a result, Dr. Woodside was harmed, and continues to be harmed, as he has suffered economic and non-economic loss, including but not limited to, lost wages, lost benefits, damage to professional reputation, emotional distress, outrage, and humiliation.

## COUNT V
## TORTIOUS INTERFERENCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE
### *(As to Defendants Sonnenday and Dimick)*

115.   Dr. Woodside reasserts and incorporates the allegations set in the foregoing paragraphs as though fully reinstated herein.

116.   Dr. Woodside has a business expectancy of being hired by other academic institutions and/or hospitals.

117.   This business expectancy has a reasonable likelihood of future economic benefit for Dr. Woodside.

118.   Defendants Sonnenday and Dimick knew of the business expectancy at the time of the claimed interference.

119.   Defendant Sonnenday intentionally and improperly interfered with the business expectancy by spreading false information amongst Defendant U-M's employees, irreparably harming his reputation, and further spreading false information to third parties looking to hire Dr. Woodside.

120.   Defendant Dimick intentionally and improperly interfered with the business expectancy by spreading false information amongst Defendant U-M's employees, irreparably harming his reputation, destroying Dr. Woodside's applications to third parties.

121.   Defendant Sonnenday and Dimick's conduct caused potential employers to avoid a business relationship or expectancy with Dr. Woodside.

122.   As a result, Dr. Woodside was harmed, and continues to be harmed, as he has suffered economic and non-economic loss, including but not limited to, lost wages, lost benefits, damage to professional reputation, emotional distress, outrage, and humiliation.

### COUNT VI
### FALSE LIGHT
*(As to Defendant Sonnenday)*

123.   Plaintiff reasserts and incorporates the allegations set in the foregoing paragraphs as though fully reinstated herein.

124.   Defendant Sonnenday made various false statements about Dr. Woodside to third parties as described herein.

21

125. These false statements were highly objectionable as they attributed highly unprofessional and inappropriate behavior to Dr. Woodside.

126. Defendant Sonnenday had knowledge of or acted in reckless disregard as to the falsity of these statements.

127. As a result, Dr. Wodside was harmed, and continues to be harmed, as he has suffered economic and non-economic loss, including but not limited to, lost wages, lost benefits, damage to professional reputation, emotional distress, outrage, and humiliation.

## COUNT VII
## PUBLIC DISCLOSURE OF PRIVATE FACTS
### *(As to Defendant Sonnenday)*

128. Plaintiff reasserts and incorporates the allegations set in the foregoing paragraphs as though fully reinstated herein.

129. Defendant Sonnenday caused the disclosure of private information that was not already a matter of public record or otherwise open to the public eye by sharing with third parties ultimately unsubstantiated allegations against Dr. Woodside .

130. Unsubstantiated and false concerns about Dr. Woodside and workplace incidents unrelated to misconduct are of no legitimate concern to third parties.

131. Defendant Sonnenday's persistent sharing of Dr. Woodside's private information is highly offensive to the reasonable person.

132.   As a result, Dr. Woodside was harmed and continues to be harmed, as he has suffered economic and non-economic loss, including but not limited to lost wages, lost benefits, damage to professional reputation, emotional distress, outrage, and humiliation.

### COUNT VIII
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*(As to Defendants Sonnenday and Dimick)*

133.   Plaintiff reasserts and incorporates the allegations set in the foregoing paragraphs as though fully reinstated herein.

134.   Defendant Sonnenday has continuously spread false and harmful information about Plaintiff.

135.   Defendant Sonnenday has gone so far as to spread this false information to Dr. Woodside's current employer as well as potential employers.

136.   Both Defendants Sonnenday and Dimick inappropriately destroyed Dr. Woodside's reputation and improperly participated in the conversations that led to Dr. Woodside's non-renewal and ultimate termination

137.   Defendant Sonnenday and Dimicks's conduct as outlined in this Complaint was extreme, outrageous, and of a character not to be tolerated by a civilized society.

138.   Defendant Sonnenday and Dimicks's conduct resulted in severe and serious emotional distress.

139. As a direct and proximate result of Defendant Sonnenday and Dimicks's conduct, Dr. Woodside has been damaged; he has lost job offers, lost professional opportunities, and suffered embarrassment and humiliation.

## RELIEF REQUESTED

For all of the foregoing reasons, Dr. Woodside demands judgment against Defendants as follows:

a. Declare the practices and actions of Defendant U-M as unlawful employment practices in violation of the U.S. Constitution and/or ELCRA;

b. Compensatory damages in whatever amount he is found to be entitled;

c. Exemplary damages in whatever amount he is found to be entitled;

d. Award punitive damages in whatever amount he is found to be entitled;

e. An award of interest, costs, reasonable attorney fees, and expert witness fees;

f. Equitable relief, including reappointment an injunction prohibiting any further acts of wrongdoing against him; and

g. Award whatever other relief this Court finds appropriate.

Respectfully Submitted,

**NACHTLAW, P.C.**

*/s/ David A. Nacht*
David A. Nacht (P47034)
Dated: January 1, 2025                    Attorneys for Plaintiff

## JURY DEMAND

NOW COMES Plaintiff KENNETH J. WOODSIDE, by and through his attorneys, NACHTLAW, P.C., and hereby demands a trial by jury in the above-captioned matter for all issues so triable.

Respectfully Submitted,

**NACHTLAW, P.C.**

*/s/ David A. Nacht*
David A. Nacht (P47034)
Dated: January 1, 2025                    Attorneys for Plaintiff

25